INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO et al., Appellants,

v.

Clarence B. WILKINS, Appellee.

No. 13813.

Court of Civil Appeals of Texas.

Houston.

Jan. 11, 1962.

Rehearing Denied Feb. 1, 1962.

Sewall Myer, Houston, for appellant.

Al L. Crystal, Houston, Ambrose Luko-
vich, Galveston, for appellee.

WERLEIN, Justice.

This suit was brought by appellee, Clarence B. Wilkins, against appellant for damages which appellee alleges he suffered as a result of being indefinitely suspended from membership in the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO, a national labor organization hereafter referred to as International or Union, and from membership in Local Union No. 132 of said International Brotherhood, hereinafter referred to as Local 132. The trial court rendered judgment in favor of appellee for $7,000.00, based upon the jury verdict consisting of answers to two issues.

In answer to Special Issue No. 1 the jury found that the Trial Committee appointed by the president of the International Brotherhood was arbitrary, capricious and acted in bad faith in arriving at its decision. It is appellant's contention that there is no evidence of bad faith, arbitrariness or capriciousness upon the part of the Trial Committee, and that the constitution of the International Brotherhood was substantially complied with in connection with the proceedings which resulted in the indefinite suspension of appellee from the Union, and that the court erred in not granting appellant's motion for judgment non obstante veredicto.

The evidence shows that on August 11, 1955 appellee, a member of Local 132, called at the office of J. R. Huff, the Business Agent of said Local in Galveston, Texas, and that an argument ensued between appellee and Mr. Huff with respect to appellee's claim that he was not getting his fair share of employment. After words passed between the two men, appellee left the office and returned approximately 30 minutes thereafter, and asked again to see Mr. Huff, who was in his own office adjoining his secretary's office where appellee applied.

Mr. Huff left his office and entered his secretary's office where he sat down to talk with appellee who was standing on the other side of the partition wall between the office and the hall. After some words between them appellee drew a pistol, and, firing through an opening in the glass partition between the hall and the secretary's office, shot Mr. Huff as he sat in his shirt sleeves by his secretary's desk. Then appellee broke a part of the glass partition which he said was foggy and obscured his vision, and again shot Mr. Huff, who had arisen from his chair. Mr. Huff fell and died without regaining consciousness. Appellee testified that he did not see any gun in the secretary's office or on Mr. Huff, but that he had to kill him. He also said that before he shot Mr. Huff, Huff had reached for a drawer in the secretary's desk. Mr. Huff was unarmed and there was no gun in the secretary's desk or office.

Later appellee sent a $10.00 cashier's check dated September 8, 1955, to Local 132 in payment of his August and September dues. His check was returned with a letter from the Union's District Representative on September 13, 1955, advising him that his membership had been suspended by the International President. Appellee then sent a letter on September 19, 1955 to the International President, enclosing said dues and stating that it was his understanding that under the constitution of the International, a member before being suspended had to be notified and brought to trial and that if he was under suspension he demanded an immediate trial. To such letter the International President replied on September 27, 1955 that he was endeavoring to obtain a Trial Committee under Article V, Sec. 3(b), page 19, of the constitution; that appellee's insurance would be protected pending a report of the Trial Committee; and that appellee would be notified of the date, time and place to appear before the Trial Committee. On the same day the International President wrote a letter appointing a Trial Committee and charging that the killing of Mr. Huff was in violation of the declared policies of the International Brotherhood, as follows:

"September 27, 1955
"File: L–132–55–3

"Mr. L. C. Roberts, B.M. L–37
"2005 Melpomene Avenue
"New Orleans, Louisiana.

"Mr. M. F. Thomas, B.M. L–74
"8203 Leander Street
"Houston, Texas

"Mr. E. A. Vincent, B.M. L–79
"932½ Bilbo Street
"Lake Charles, Louisiana.

RE: Clarence Benson Wilkins
Register #542323
2006 Bogota Street
LaMarque, Texas

"Gentlemen and Brothers:

"Under the authority conferred upon me as International President of the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, by Article V, Section 2 of the International Lodge Constitution, I have suspended from membership in this International Brotherhood and in Local Lodge No. 132 of Galveston, Texas, Clarence Benson Wilkins, Register No. 542323, because of the unprovoked murder of J. R. Huff, Business Manager of Local Lodge No. 132.

"The said suspension was made under the authority of Article V, Section 3(a) of the International Lodge Constitution. In my opinion as Inter-

national President, great and irreparable damage may be done to the International Brotherhood and to Subordinate Lodge No. 132 by my failure to act.

"I have therefore, appointed a Trial Committee of three members of which you are one.

"My reason for peremptorily exercising the said authority is that on Thursday, August 11, 1955, the said Clarence Benson Wilkins did, in the office of Local Lodge No. 132, shoot and kill the said J. R. Huff, Business Manager of said Local Lodge 132, and that the said killing was without lawful provocation. The said killing was in violation of the declared policies of the International Brotherhood.

"I request you to familiarize yourself with Article V of the International Lodge Constitution, and note that paragraph (b) of Section 3 of the said Article V provides that the Trial Committee shall, within ten (10) days following the receipt of this statement, convene in the City of Galveston, Texas; that upon so convening the Trial Committee shall organize and shall at once dispatch a copy of this statement of the International President to Subordinate Lodge No. 132 and to the accused member, Clarence Benson Wilkins; and that the Trial Committee shall notify the accused, Clarence Benson Wilkins, to appear for trial before the said Trial Committee, at a time and place in said notice designated which shall be five (5) days from the date of dispatching the said notice, unless the accused desires more time up to, but not more than fifteen (15) days.

"Fraternally,

"/s/ W. A. Calvin
"WILLIAM A. CALVIN
International President

"wac:mc
"cc: J. P. McCollum, I.V.P.
"oeiu#320afl"

———◆———

On October 6, 1955 the Trial Committee notified appellee of its appointment and sent him a copy of the foregoing charges and notified him of the date, time and place where the Trial Committee would hear and determine his guilt or innocence upon such charges. Appellee appeared at such hearing accompanied by a Mr. Clark, not an attorney at law but a member of the Union, who represented appellee as his counsel at the hearing. At the conclusion of the trial appellee's counsel expressed his appreciation to the Committee as a whole for the fair and just manner in which it had conducted the trial. Shortly thereafter the Committee rendered its decision in writing that appellee was guilty of shooting and killing Mr. Huff,

and assessed the penalty of indefinite suspension.

Appellee appeared in person at the hearing and testified before the Trial Committee. There was no evidence before the Committee other than appellee's testimony and the written statement made by Mr. Huff's secretary, Pauline Overly, who did not actually see the shooting but who heard the argument preceding the shots and the breaking of the glass partition by appellee. Appellee's counsel agreed to the submission of the written statement by the secretary who was understood to be ill, and did not request any postponement for the purpose of bringing her in person before the Committee.

The Trial Committee sent a transcript of the hearing to Mr. Calvin, the International Brotherhood President, who approved the Committee's indefinite suspension of appellee. Appellee was given an opportunity to appeal to the Executive Council of the International, but stated that he was financially unable to go to Kansas City where the Executive Council met, and neither he nor his counsel appeared at the hearing before the Executive Council. The Executive Council approved the Trial Committee's action indefinitely suspending appellee from the Union.

■ The controlling question in this suit is whether or not there was any evidence of probative force that the Union's action in indefinitely suspending appellee was arbitrary, capricious and in bad faith. If there was such evidence, then the court did not err in submitting the issue to the jury and in refusing to enter judgment non obstante veredicto. Appellee had a right to prosecute his suit for damages if his suspension was wrongful and not in conformity with the constitution of the International Brotherhood. International Printing Pressmen etc. v. Smith, 1946, 145 Tex. 399, 198 S.W.2d 729; Anderson v. Painters' Local Union No. 318, Tex.Sup. 1960, 338 S.W.2d 148; St. Louis & S. W. Ry. Co. of Texas v. Thompson, 1908, 102 Tex. 89, 113 S.W. 144.

■ Appellee contends that there is evidence that the action of the Union was arbitrary and in bad faith and he points to several statements and circumstances which he says warranted the submission of said issue and support the jury's answer thereto. He asserts that the International President did not comply with the constitution in suspending him without first giving him notice, and violated the constitution in failing to appoint a Trial Committee within the time therein specified, and in failing to give the Trial Committee a written statement of his reasons for peremptorily suspending appellee, and also in failing to give

appellee proper notice of the hearing before the Trial Committee. Appellee probably waived any such irregularities, if such there were, by voluntarily appearing before the Trial Committee and fully presenting his case. But regardless of this, we think that the preliminaries prior to the hearing substantially complied with the requirements of the constitution of the International.

Article V, Section 2 of the constitution gives the International President power to suspend a member of a local lodge when in his judgment the actions of a member are in violation of the International Lodge constitution and/or subordinate Lodge constitution or in violation of the declared policies of the International Brotherhood. Article V, Section 3(a) provides in substance that when in the opinion of the International President great and irreparable damage shall or may be done to the International Brotherhood or to the affected District or Subordinate Lodge by his failure to act, he may suspend a member prior to giving him notice. This is exactly what the International President did, as shown by said letter of September 27, 1955. It is true that he did not within ten days of the suspension appoint a Trial Committee, but he did appoint such Trial Committee within fourteen days from the date of the letter of the District Representative, C. E. Alexander, Jr., notifying appellee of his suspension. We think this substantially complied with the constitution. The delay did not in any way prejudice appellee.

Article V, Section 3(b) of the constitution provides in substance that the International President shall give to the Trial Committee a written statement of his reasons for the peremptory exercise of his authority and a specified recital of the violation of the International Lodge constitution and/or subordinate Lodge constitution, or of the declared policies of the International Brotherhood, of which the International President believes the member to be guilty. This was done by the International President in his letter of September 27, 1955. The constitution further provides that the Trial

Committee shall then convene and shall at once dispatch a copy of said statement of the International President to the Subordinate Lodge affected and to the accused to appear at a time and place therein designated which shall be five days from the date of dispatching said notice unless the accused desires more time up to but not more than fifteen days. The Trial Committee complied with the constitutional requirements by duly notifying appellee of the date, time and place of the hearing and furnishing him a copy of the statement of the International President, which although not as precise in form as a legal indictment, did advise appellee with what he was charged and would be tried.

The letter clearly charged that the killing was without lawful provocation and in violation of the declared policies of the International Brotherhood. The uncontroverted testimony of Vice President McCollum was that to his knowledge for many, many years prior to August 11, 1955 the declared policy of the International Brotherhood as referred to in the constitution with reference to a member assaulting an officer, was that if the member is tried and found guilty he is suspended from membership by the Brotherhood.

█ Mr. L. C. Robert, a member of the Committee, acted as chairman at the hearing and read the charge. No postponement of the hearing was requested by appellee to obtain witnesses, although his counsel did request the Committee to recommend to the International President that the trial be held in abeyance until appellee had been tried in the civil courts. Such request was properly overruled by Mr. Robert on the ground that the Committee was not to be governed by the court. The trial proceeded in an orderly manner and appellee testified fully. Appellee's counsel agreed that the written statement of Pauline Overly be accepted in evidence. Appellee complains that at one point in the hearing, while Mr. Robert was asking appellee some questions and Mr. Vincent, another member of the Committee, was presiding, Mr. Robert made a statement evidencing prejudice against appellee. The following is what occurred:

"Robert: When you went into the building you had a gun in your pocket?

"Wilkins: Yes.

"Robert: In the heat of the argument you had the presence of mind to walk out for fear that trouble would arise?

"Wilkins: Yes.

"Robert: You went around the corner and approximately ½ hour elapsed before you returned. Don't you think you had time to cool off and realize that you should go home?"

Clark objected to this question.

Robert stated that he thought that if Wilkins had gone home when he left the hall the first time the trouble would not have happened.

Clark objected.

Chairman Vincent sustained the objection.

Robert's comment to which an objection was sustained was a statement of an obvious fact from which no reasonable inference of prejudice or bad faith could be drawn.

Appellee also asserts, in an attempt to show prejudice and bad faith on the part of the Union, that J. P. McCollum, a vice president thereof, had been charged by a Mr. Head with certain reprisal actions against appellee. Mr. McCollum denied the charges. He testified at the trial of the case in the District Court that he did not know appellee at the time of the shooting; that after the shooting he was not in touch with the things that were done in connection with bringing appellee to trial or suspending him; that although he was a member of the Executive Council of the International, he took no part at the hearing by the Council because of the Union's policy that the vice president, whose district included the affected area, shall not vote or make any

recommendations; and that the charges of Mr. Head against him were thrown out by the McClelland Committee after a hearing. The uncontradicted evidence also shows that the unsigned article in the October, 1955 issue of the Unions' Journal published in Kansas City, in which it was stated that James R. Huff was coldbloodedly shot to death in his office, was not read at the Committee hearing. Mr. Vincent, a member of the Committee, testified he had never seen the statement. There is no evidence that the other members of the Committee had read the article.

In determining whether there was any evidence that would warrant the submission of Issue No. 1 inquiring as to whether the Trial Committee was arbitrary, capricious and acted in bad faith in arriving at its decision, and in passing upon the Trial Court's refusal to enter judgment non obstante veredicto, all evidence must be considered in light most favorable to appellee and every reasonable intendment deducible from the evidence must be indulged in his favor. Collett v. Collett, Tex.Civ. App. (1948), 217 S.W.2d 60, writ ref., n. r. e.; Reserve Life Ins. Co. v. Everett, Tex.Civ.App.1955, 276 S.W.2d 926; Maxey Lumber Company v. De Graw, Tex.Civ. App., 278 S.W.2d 607, writ ref., n. r. e.

We have carefully examined and reviewed the entire record, including the proceedings had before the Trial Committee, and the exhibits introduced in evidence. Considering the evidence in the most favorable light to appellee, we have concluded that there is no evidence in this case that either the Trial Committee or the Union or the International President acted arbitrarily or capriciously or in bad faith in indefinitely suspending appellee from membership in the International Brotherhood and Local 132. We think there is nothing in the record that shows that the Trial Committee did not exercise an honest judgment. The record shows that the Committee acted upon substantial evidence which warranted their finding and decision. Even if we

entirely disregard the statement of Pauline Overly, the admissions and testimony of appellee himself constitute substantial evidence of conduct justifying appellee's indefinite suspension from the Union on the charges preferred against him.

In our opinion it was error on the part of the Trial Court not to grant appellant's motion for judgment non obstante veredicto.

The judgment of the trial court is reversed and rendered.